IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
On Briefs September 27, 2006

## STATE OF TENNESSEE DEPARTMENT OF CHILDREN'S SERVICES v. PATRICIA DANIELLE STINSON, ET AL.

**A Direct Appeal from the Juvenile Court for McNairy County**
**No. C-581     The Honorable Danny Smith, Judge**

---

**No. W2006-00749-COA-R3-PT - Filed October 30, 2006**

---

This is a termination of parental rights case involving two minor children. The mother of both children and the father of one of the children appeal separately from the Order of the Juvenile Court of Hardin County terminating their respective parental rights. Both Appellants assert that the grounds for termination of their parental rights are not met by clear and convincing evidence in the record, and that termination of their parental rights is not in the best interest of the minor children. Because we find clear and convincing evidence in the record to support the trial court's findings, we affirm.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Juvenile Court Affirmed**

W. FRANK CRAWFORD, P.J., W.S., delivered the opinion of the court, in which ALAN E. HIGHERS, J. and DAVID R. FARMER, J., joined.

Stephanie L. Prentis of Savannah, Tennessee for Appellant, Jason Henry

Roger Stanfield of Jackson, Tennessee for Appellant, Patricia Stinson

Paul G. Summers, Attorney General and Reporter; Michael B. Leftwich, Assistant Attorney General for Appellee, Tennessee Department of Children's Services

**OPINION**

C.S.L.S. was born on November 22, 2000 to Patricia Danielle Stinson.  At the time of C.S.L.S.'s birth, Ms. Stinson was married to Stephen L. Stinson and Mr. Stinson was listed as the father on C.S.L.S.'s birth certificate.  However, DNA testing revealed that Jason Henry (together with Ms. Stinson, "Appellants") was the biological father of C.S.L.S.  The trial court entered an order on July 28, 2003 finding Mr. Henry to be the biological father of C.S.L.S.

T.D.S. (together with C.S.L.S., the "Children") was born on April 20, 2002 to Ms. Stinson. Although Ms. Stinson was married to Mr. Stinson at that time, Mr. Stinson surrendered his parental rights to T.D.S. on January 27, 2003. Ms. Stinson later revealed Larry Turner to be the father. However, DNA testing proved that Mr. Turner was not T.D.S.'s father and Mr. Turner was dismissed from this case on March 10, 2005. In its Order of March 10, 2005, the trial court found, in accordance with T.C.A. §§ 36-1-113 and 36-1-117 that there was no one else to be named as a defendant in this case as there were no other legal parents to be named, and no other biological or putative parents to be served.

The Children were taken into the custody of the State of Tennessee, Department of Children's Services ("DCS," or "Appellee") on or about August 27, 2002. On or about August 30, 2002, DCS filed a petition for temporary custody of the Children. The petition alleges that, at the time they were taken into custody, the Children had been in the care of one of Ms. Stinson's friends. The DCS petition indicates that both Children had diaper rash, head lice, and were very dirty. T.D.S., who was four months old at that time, had what appeared to be a healing cigarette burn. C.S.L.S. also had circular marks on his body. Ms. Stinson's alleged history of drug abuse and her inability to provide stable housing were also listed as reasons for DCS custody. On August 30, 2002, the trial court entered a Protective Custody Order. The Children were placed in the foster care of Mary and Ruben Damron, where they have remained since that time. The foster family wishes to adopt the Children should this Court affirm termination of Appellants' parental rights.

A preliminary hearing was held on September 3, 2002. On October 22, 2002, the trial court entered an Order in which it found, *inter alia*, that the Children were dependent and neglected. The trial court granted temporary custody to DCS, and appointed a Guardian ad Litem for the Children. The Order also indicates that, at the time of the hearing, Mr. Henry was incarcerated. An adjudicatory hearing was held on May 8, 2003. On July 28, 2003, the trial court entered its "Order of Adjudication of Dependency and Neglect," in which the trial court continued temporary custody of the Children with DCS.

After the Children came into DCS custody, DCS established a permanency plan for each child. On September 18, 2002, Ms. Stinson agreed to the permanency plans, which had as their primary goal a return of the children to their parents and an alternate goal of adoption. Under the plans, Ms. Stinson was assigned a number of responsibilities including resolving all legal and criminal issues, taking parenting classes, submitting to drug and alcohol counseling, submitting to drug testing, establishing paternity, and obtaining and maintaining employment. The record indicates that Ms. Stinson participated in the preparation of these plans.

As briefly discussed above, at the time the Children were taken into protective custody, Ms. Stinson identified Jason Henry as the father of C.S.L.S., despite the fact that she had previously told Mr. Henry that he was not the father. Mr. Henry has a history of drug abuse and criminal activity. Prior to C.S.L.S.'s birth, Mr. Henry was convicted of possession of Schedule II drugs with intent to sell and two counts of theft over $1,000. Following his conviction, Mr. Henry was initially placed on probation after serving several months in jail; however, his probation was revoked quickly when

he violated the conditions of his probation. At the time of the hearing in this case, Mr. Henry was serving an eight year sentence. He is not scheduled for release until 2007.

By her own testimony, Ms. Stinson began using alcohol and marijuana when she was twelve years old and starting using cocaine at age fifteen. Ms. Stinson has been arrested numerous times and, on several occasions, she has spent time in jail on drug and other charges. One incarceration lasted from October 7 to November 13, 2003, and another began on January 4, 2004.

On or about October 14, 2003, the permanency plans were amended to make adoption the sole goal because the Children had been in DCS custody for fourteen months and there had been little progress with Ms. Stinson on completion of her goals and requirements under the original plans. At that time, there had been a long gap in visitation, due in large part to Ms. Stinson's incarceration, and Ms. Stinson had allegedly not met any of the goals of the permanency plans. Although Ms. Stinson did not participate in the revision of the plans, Mr. Henry's father was present and signed the plans. Throughout these proceedings, Mr. Henry's father has expressed some interest in custody of C.S.L.S; however, he has only expressed interest in custody of T.D.S. if, by taking custody of T.D.S., he can gain custody of his biological grandson, C.S.L.S. The permanency plans were again reviewed in October 2004. At that time, adoption remained the sole goal.

On January 5, 2004, DCS filed a Petition to terminate the parental rights of Ms. Stinson. This petition also seeks to terminate the parental rights of Mr. Henry as to C.S.L.S. and the parental rights of Mr. Turner as to T.D.S.[1] The Petition reads, in pertinent part, as follows:

> Pursuant to T.C.A. 36-1-102(1)(A)(i) and (iv) and 36-1-113(g)(1), the Department submits that grounds for Termination of Parental Rights exist based on abandonment by the fathers in that they have rarely if ever visited or had any contact with the children; they have failed to support the children in-kind or directly through child support; and they have failed to establish a suitable home. The fathers, both of whom are incarcerated, and for 4 months prior to the filing of this petition, have willfully failed to pay support for four months immediately preceding the incarceration and have engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the children.
>
> *                         *                         *

[1] As discussed above, Mr. Stinson (who was married to Ms. Stinson at the time of T.D.S. birth) surrendered his rights to the child on January 27, 2003. Although Ms. Stinson named Mr. Turner as the biological father of T.D.S., he has never legitimated the child. After DNA testing revealed that Mr. Turner was not the father of T.D.S., Mr. Turner was dismissed from the case on March 10, 2005. He is not a party to this appeal.

Pursuant to Tennessee Code Annotated section 36-1-113(g)(2), the Department submits that grounds for Termination of Parental Rights exist based on substantial noncompliance by parents with the statement of responsibilities in the Permanency Plan pursuant to the provision of title 37, chapter 2, part 4.

a) The Permanency Plans, revised, ratified and made an Order of the Court on September 18, 2002, for these children, contains the following provisions:

1. That the goals are Return to Parent and Adoption.

2. That the mother will make an appointment with Quinco Mental Health Center to address domestic violence issues in the home. That she will resolve all legal/criminal issues with the court and remain free of criminal activities and behaviors. She was to enroll in the domestic violence counseling by September 30, 2002 and provide summaries and a certificate of completion to DCS.

3. That Ms. Stinson would attend and participate in parenting classes at Quinco to identify safety and supervision issues with the children and in the home. Monthly summaries and a certificate of completion were to be delivered by the mother to DCS.

4. Ms. Stinson was to attend and participate in A&D counseling with Pathways in Jackson. She was to submit to an initial hair screen for which she was responsible for payment. She was to get random drug urine screens for six months thereafter for which DCS would pay. She was to complete the A & D counseling and bring a copy of the completion to DCS. She was to test negative on all drug screens.

5. Ms. Stinson was to obtain and maintain employment to provide financially for the children; bring a copy of her paycheck each payday to DCS and provide the name and number of her employer to DCS for verification purposes.

6. Ms. Stinson would visit with the children at least 4 hours every 28 days and advise DCS when she had conflicts with her work schedule or other visitation conflicts.

7. That she participated in the making of the Plan, discussed it and agreed with it.

\*                                        \*                                        \*

b) The Court found that the mother failed in every respect to comply with her plan at the hearing on July 28, 2003. She has not been able to comply since that time, either.

IX

-4-

Pursuant to Tennessee Code Annotated section 36-1-113(g)(3)(A)(i-iii), the Department submits that grounds for Termination of Parental Rights exist, because the children...have been removed from the home of the parents by order of this Court for more than six (6) months, and the conditions which led to the children's removal, or other conditions which in all reasonable probability would cause the children to be subjected to further abuse or neglect, and which, therefore, prevent the children's safe return to the care of the parents, still persist; and, there is little likelihood that these conditions will be remedied at an early date so that the children can be safely returned to the parents in the near future; and, the continuation of the parent and child relationship greatly diminishes the children's chances of early integration into a safe, stable and permanent home.

The Court found in the Preliminary Hearing Order entered on or about October 22, 2002, that the children were dependent and neglected by clear and convincing evidence as stipulated to by the mother because of the following:

That the children had been left with friends of the mother and that the children's buttocks were very red and irritated from diaper rash. The four month old had what appeared to be a cigarette burn in the process of healing and both children had head lice and were very dirty. There were circular marks on the [one] year old. The mother had a history of drug abuse and moved frequently such that DCS could not locate her for investigation.

Jason Henry stipulated at the time that he was incarcerated and could not contest the petition. The mother has just been released from Hardin County Jail where she was incarcerated for 32 days in October and November this year. She was supposed to go to rehabilitation or complete a sentence of 11 months, 29 days, but she went to rehabilitation instead. However, she only lasted two days before she left. She has not been picked up by law enforcement yet and remains for the time being with her grandfather.

The mother hardly visited with the children from Easter, 2003 until November, 2003 although since November she has started to see them again when the foster mother initiates the visits. The mother was living in a crack house with 4 men prior to the last incarceration. She is still using drugs and is not able to care for the children. The oldest boy has some familiarity with her but the youngest doesn't know her.

When the mother told the 4 year old this past July "To kiss Mommy", he kissed the foster mother.

The children have rarely if ever seen their fathers.

The mother did not appear in Court for the adjudicatory hearing on July 28, 2003 and the court found the children were dependent and neglected by clear and convincing evidence. The Court found that the mother was using crack cocaine, living with two men, failing to visit her children, failing to go to Pathways, failing to appear for drug screens, failing to communicate with DCS, and without food or money on occasion.

The Court found that DCS made reasonable efforts including but not limited to counseling and parenting.

Very little appears to have changed since the time of that court order.

The mother does not appear to be able to remedy her conditions in the near future as she has done nothing new since the time the children have been removed. The fathers, Jason Henry and Larry Turner, are in prison. The foster parents want to adopt the children and provide them a safe and loving home. The children are bonded with the foster parents and see them as their only parents.

*                          *                          *

It is in the best interest of said child[ren] and the public that all of the parental rights of Respondents to said children be forever terminated and that the complete custody, control and guardianship of said children be awarded to the State of Tennessee, Department of Children's Services, with the right to place said children for adoption and to consent to said adoptions in loco parentis. Pursuant to Tennessee Code Annotated section 36-1-113(i)(1-9), the Petitioner avers that it would be in the best interests of the above-named children that Respondents' parental rights be terminated because:

f) Respondents have failed to make an adjustment of circumstance, conduct, or conditions as to make it safe and in the children's best interests to be in the home of the parents; and/or ,

g) Respondents have failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible; and/or,

h) Respondents have failed to maintain regular visitation or other contact with the children; and/or,

i) Respondents have failed to establish a meaningful relationship between the parent and children; and/or,

j) The children's emotional and psychological conditions would be adversely affected by effecting a change of caretakers; and/or

k) Respondents have failed to maintain a physical environment of the parent's home which is healthy and safe, there is criminal activity in the home, and/or there is use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the children in a safe and stable manner; and/or,

l) Respondents' mental and/or emotional status would be detrimental to the children or prevent the Respondent from effectively providing safe and stable care and supervision for the children; and/or

m) Respondents have not paid child support consistent with the child support guidelines at any time during the children's custody in the Department.

These children barely know their parents. They are doing well in the foster home and they are thriving. The mother and fathers cannot provide any home at all for the children. To change caretakers would be devastating to them. The parents have made no efforts to become more than biologically related to the children; they have paid no support and the fathers have sent no gifts. The fathers have been consistently advised of court proceedings and meetings to discuss the children and their progress in foster care and have rarely, if ever, attended. The mother has said on occasion that the foster parents should adopt the children. She would show true love for them if she did surrender her rights as she so often stated she would do. She cannot stay away from cocaine and other drugs in the foreseeable future. She has to take care of herself first before she can take care of these children and she has a long way to go before that happens. DCS has tried to help the mother through various programs such as parenting and counseling, referrals for A & D counseling and rehabilitation, but the mother has not been successful.

The trial of this matter took place before the court, sitting without a jury, on March 10, 2005, June 29, 2005, and July 27, 2005. Following a hearing on February 14, 2006, the trial court entered an Order terminating the parental rights of Ms. Stinson to C.S.L.S. and T.D.S., and

terminating the parental rights of Mr. Henry to C.S.L.S. In its Order, the trial court summarizes the evidence adduced at the hearing and makes the following, relevant, findings therefrom:

27. That the children have been in the continuous legal care and control of the State of Tennessee, Department of Children's Services, since on or about August 27, 2002. That the mother stipulated to the dependency and neglect of the children at the preliminary hearing on October 22, 2002 and that the children were adjudicated to be dependent and neglected children by order of the court on July 28, 2003, at which the mother failed to appear.

28. That the mother made no visits with the children from Easter of 2003 until November 2003 and that the few visits between that time and the filing of the petition to terminate parental rights on January 5, 2004 were initiated by the foster mother taking the children to visit the mother while she was incarcerated in the McNairy County Jail. Prior to her entry into the McNairy County Jail, she failed to visit although she was capable.

29. The children have been in custody more than 6 months, conditions that caused the children to come into custody persist or other conditions exist in which in all reasonable probability would cause the children to be subjected to further abuse or neglect and which therefore prevent the children's safe return to the parents. There is little likelihood that these conditions will be remedied at an early date and the continuation of the parent and child relationship greatly diminishes the children's chances of early integration into a safe, stable and permanent home. There is nothing to show that the conditions may change in the foreseeable future.

30. That Jason Henry, the father of [C.S.L.S.], has had only rare if any contact with his child, that he has failed to provide any support for the child, has failed to establish a suitable residence for the child and has no ability to do so in the near future, and he engaged in conduct consisting of drug use and criminal activity prior to his incarceration that evidences a wanton disregard for the welfare of his child. That he had the ability to work, the ability to spend money on other things, the ability to use drugs, and showed no interest in the child during that time.

31. That there has been substantial noncompliance by the mother, Patricia Danielle Stinson, with the permanency plans created for her by her own admission and the testimony of others at the hearings in

this cause. The mother did not substantially complete any of the requirements prior to the filing of the petition to terminate her parental rights.

32. The children are in an adoptive home where they are well cared for and are thriving and are doing well in the home and the home is a stable and loving home.

33. That the Court hereby makes the specific findings that the State has met its burden of proof by clear and convincing evidence as to each of the grounds alleged in the petition filed in this cause based upon the facts testified at each of the hearings in this cause. As to the ground of abandonment, the father failed to visit for more than four (4)months prior to his incarceration and engaged in activities prior to his incarceration which evidenced a wanton disregard for the welfare of his child, and that each have failed to make any child support payments since the children have been in state custody. As to the grounds of failure to substantially comply with her permanency plan, Patricia Stinson has not taken a part in a staffing in over a year and has done little if anything to seek return of the child[ren] or permanency for the child[ren] and that there is no evidence, material or otherwise, of any attempt at compliance. As to the persistent conditions and likelihood the conditions will remedy themselves at an early date, the court hereby finds that because the children have been removed from the home of the parents by order of this Court for more than six (6) months and because the conditions which led to the children's removal or other conditions which in all reasonable probability would cause the children to be subjected to further abuse or neglect and which, therefore, prevent the children's safe return to the care of the parents, still persist; and the court hereby finds that there is little likelihood that these conditions will be remedied at an early date so that the children can be safely returned to the parents in the near future; and the court hereby finds that the continuation of the parent and child relationship greatly diminishes the children's chances of early integration into a safe, stable and permanent home specifically because the children were removed from the mother as they were not being properly cared for and had been dropped off and the mother had a history of drug usage and frequently moved; that the father is presently incarcerated and may be until 2007; mother has submitted to only one drug screen in 2002 which she failed and has failed to submit to any more (even one requested this summer after her release from the Teen Challenge Program) even though each of her case managers requested that she submit to screens; as Ms.

Stinson has failed to maintain regular contact with each of her case managers including the case manager she has now and since her release from the Teen Challenge Program; and because there is no evidence, material or otherwise, that she even attempted to complete her permanency plan prior to the filing of the petition to terminate her parent rights; therefore, the conditions that caused the children to come into custody persist and conditions exist which in all reasonable probability would subject the children to further neglect or abuse and there is nothing to show that they may change in the foreseeable future.

34. As to the best interest of the children, the Court makes the following findings by clear and convincing evidence: that Patricia Danielle Stinson and Jason Henry have failed to make an adjustment of circumstance, conduct, or conditions as to make it safe and in the children's best interest to be in the home of the parent; that Patricia Danielle Stinson has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible; that Patricia Danielle Stinson and Jason Henry have failed to maintain regular visitation or other contact with the children; that a change of caretakers would have a harmful effect on the children's emotional, psychological and medical condition; that Patricia Danielle Stinson and Jason Henry have failed to establish and maintain a meaningful relationship between themselves and the children; that Patricia Danielle Stinson and Jason Henry have failed to maintain a physical/home environment which is healthy and safe; that there is criminal activity in the home, and/or there is use of alcohol or contolled substances as may render the parent or guardian consistently unable to care for the children in a safe and stable manner; that each of the parent's mental and/or emotional status would be detrimental to the child or prevent the mother from effectively providing safe and stable care and supervision for the child; and that neither has paid child support consistent with the child support guidelines at any time during the children's custody in the Department.

35. Pursuant to Tennessee Code Annotated section 36-1-113(g), grounds for Termination of Parental Rights exist based on abandonment by the mother as defined by law, because of the facts as above-enumerated.

36. Pursuant to Tennessee Code Annotated section 36-1-113(g), grounds for Termination of Parental Rights exist based on abandonment by the father, as defined by law, because of the facts as above-enumerated.

37. Pursuant to Tennessee Code Annotated section 36-1-113(g), grounds for Termination of Parental Rights exist based on substantial non-compliance with the permanency plan by the mother, as defined by law, because of the facts as above-enumerated.

38. Pursuant to Tennessee Code Annotated section 36-1-113(g), grounds for Termination of Parental Rights exist based on persistence of conditions, as to both parents, as defined by law, because of the facts as above-enumerated.

39. That the children have been removed from the parent's home as a result of a petition filed in the juvenile court in which the children were found to be dependent and neglected, as defined in TCA 37-1-102, and placed in DCS custody and that DCS made reasonable efforts, or would have had the mother participated, to assist the mother for four months following the removal to establish a suitable home for the minor children but the mother made no reasonable efforts and she has demonstrated a lack of concern for the children to such a degree that it appears unlikely that she will be able to provide a suitable home for the children at an early date.

40. That the Respondents have willfully abandoned the children for more than four consecutive months [] preceding the filing of this petition. Ms. Stinson admitted she has paid no child support and her visitation prior to the filing of the termination petition was sporadic, token and at the initiation of the foster parent. Mr. Henry has failed to establish a relationship with his child and has failed to voluntarily take the steps to maintain contact with his child, to legitimate his child and engaged in activities which exhibited a wanton disregard for his child for the four months prior to his incarceration.

41. It is contrary to the children's welfare to remain in the legal care, custody or control of either of the parents based upon the above stated facts and based upon the facts as found by the Court this date at the termination hearing.

42. That it is in the best interest of said children and the public that all of the parental rights of the respondents, Patricia Danielle Stinson

and Jason Henry, to said children be forever terminated and that the complete custody, control and full guardianship of said children be awarded to the State of Tennessee Department of Children's Services, with the right to place said children for adoption and to consent to said adoption *in loco parentis*;

43. That an Order for Termination of Parental Rights shall have the effect of forever severing all of the rights, responsibilities and obligations of the parent to the child and of the child to the parent. The parent shall have no further right to notice of proceedings for the adoption of the children by other persons and the parent shall have no right to object to the children's adoption or thereafter, at any time, to have any relationship, legal or otherwise, with the children;

44. That it is in the best interest of the children and the public that all the parental rights of the Respondents, Jason Henry and Patricia Danielle Stinson, to [C.S.L.S.] and [T.D.S.], forever be terminated and that complete custody, control and full guardianship should be awarded to the State of Tennessee Department of Children's Services, with the right to place said children for adoption and to consent to such adoption *in loco parentis*.

**IT IS, THEREFORE, ORDERED, ADJUDGED, AND DECREED:**

1. That the Petition for the Termination of Parental Rights of Patricia Danielle Stinson and Jason Henry to said children, [C.S.L.S.] and [T.D.S.], be and is hereby granted by clear and convincing evidence upon the findings set forth above and upon the grounds as stated in the petition filed in this cause.

2. That all of the parental rights of Patricia Danielle Stinson and Jason Henry to said children be, and the same are, hereby forever terminated and that said termination is in the children's best interest.

Mr. Henry and Ms. Stinson filed separate notices of appeal. Mr. Henry raises the following issues for review as set out in his brief:

I. A. Whether there was clear and convincing evidence to terminate Appellant's parental rights on grounds of abandonment when Appellant was unaware he was the biological father of the child prior to his incarceration.

B. Whether there was clear and convincing evidence to terminate Appellant's parental rights based on wanton disregard when Appellant was unaware he was the biological father prior to his incarceration.

C. Whether there was clear and convincing evidence to terminate Appellant's parental rights based on lack of concern when the Appellant was unaware he was the biological father of the child prior to his incarceration.

II. Whether there was clear and convincing evidence to terminate Appellant's parental rights on the basis of conditions which led to removal have not been remedied or other conditions prevent return when Appellant was incarcerated the entire time of the proceedings and was unaware he was the biological father of the child prior to incarceration.

III. Whether Appellant's parental rights can be terminated when Mr. Henry was never included in any Permanency Plan and was given no statement of responsibilities to comply with in order to have the child awarded to him.

IV. Whether there is clear and convincing evidence to terminate Appellant's parental right based on mental incompetence when there was no evidence of Appellant's mental incompetence at any point throughout the proceedings.

V. Whether there was clear and convincing evidence that terminating Appellant's rights [was] in the best interest of the child.

Ms. Stinson raises the following issues for review as stated in her brief:

I. Whether the trial court's findings regarding grounds for termination of Appellant's parental rights are supported by clear and convincing evidence.

II. Whether the trial court's findings that termination of parental rights of Appellant Patricia Stinson is in the best interest of her children.

III. Whether the trial court erred in admitting into evidence, over objection, the case recordings of the Department of Children's

Services Caseworkers without regard to the admissibility of the contents.

Because this case was tried by the court sitting without a jury, we review the case *de novo* upon the record with a presumption of correctness of the findings of fact by the trial court. Unless the evidence preponderates against the findings, we must affirm absent error of law. *See* Tenn. R. App. P. 13(d). Furthermore, when the resolution of the issues in a case depends upon the truthfulness of witnesses, the trial judge who has the opportunity to observe the witnesses in their manner and demeanor while testifying is in a far better position than this Court to decide those issues. *See McCaleb v. Saturn Corp*., 910 S.W.2d 412, 415 (Tenn.1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App.1997). The weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court. *See id.*; *see also Walton v. Young*, 950 S.W.2d 956, 959 (Tenn.1997).

The standard for the termination of parental rights is well settled. The United States Supreme Court has recognized the important nature of cases involving the termination of parental rights, stating that "[f]ew consequences of judicial action are so grave as the severance of natural family ties." *M.L.B. v. S.L.J* ., 519 U.S. 102, 119 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745 (1982) (Rehnquist, J., dissenting)). Accordingly, "the interest of parents in their relationship with their children is sufficiently fundamental to come within the finite class of liberty interests protected by the Fourteenth Amendment." *Id*. The constitutional protections of the parent-child relationship require certain safeguards before the relationship can be severed. *See O'Daniel v. Messier*, 905 S.W.2d 182, 186 (Tenn.Ct.App.1995) (rev'd on other grounds); *In re: Swanson*, 2 S.W.3d 180 (Tenn .1999)).

As a safeguard, courts are required to apply the heightened "clear and convincing" proof standard. *See Santosky*, 455 U.S. at 769; *O'Daniel*, 905 S.W.2d at 186. To justify the termination of parental rights, the grounds for termination must be established by clear and convincing evidence. *See* T.C.A. § 36-1-113(c)(1) (2005); *State Dep't of Human Servs. v. Defriece*, 937 S.W.2d 954, 960 (Tenn.Ct.App.1996). Although it does not require as much certainty as the "beyond a reasonable doubt" standard, the "clear and convincing evidence" standard is more exacting than the "preponderance of the evidence" standard. *O'Daniel*, 905 S.W.2d 182, 188 (Tenn.Ct.App.1995); *Brandon v. Wright*, 838 S.W.2d 532, 536 (Tenn. Ct. App.1992). In order to be clear and convincing, evidence must eliminate any serious or substantial doubt about the correctness of the conclusions to be drawn from the evidence. *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n. 3 (Tenn.1992); *O'Daniel*, 905 S.W.2d at 188. Such evidence should produce in the fact-finder's mind a firm belief or conviction as to the truth of the allegations sought to be established. *O'Danie*l, 905 S.W .2d at 188; *Wiltcher v. Bradley*, 708 S.W .2d 407, 411 (Tenn.Ct.App.1985). In contrast to the preponderance of the evidence standard, clear and convincing evidence should demonstrate that the truth of the facts asserted is "highly probable" as opposed to merely "more probable" than not. *Lettner v. Plummer*, 559 S.W.2d 785, 787 (Tenn.1977); *Goldsmith v. Roberts*, 622 S.W.2d 438, 441 (Tenn.Ct.App.1981); *Brandon v. Wright*, 838 S.W.2d at 536.

-14-

T.C.A. § 36-1-113(c)(2005) governs termination of parental rights and requires that such termination be based upon:

> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

Here, the trial court terminated the respective parental rights of Mr. Henry and Ms. Stinson based upon grounds codified at T.C.A. § 36-1-113(g) (2005), which reads, in pertinent part, as follows:

> (g) Initiation of termination of parental or guardianship rights may be based upon any of the following grounds:
>
> (1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occured;
> (2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan or a plan of care...
> (3)(A) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
> (i) The conditions which led to the child's removal or other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect and which, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
> (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future;
> (iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

Concerning the ground of abandonment, T.C.A. § 36-1-102 (2005) defines that term, in relevant part, as follows:

> (1)(A) For purposes of terminating the parental or guardian rights of parent(s) or guardian(s) of a child to that child in order to make that child available for adoption, "abandonment" means that:

-15-

(i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child;

\*                                    \*                                    \*

(iii) A biological or legal father has either willfully failed to visit or willfully failed to make reasonable payments toward the support of the child's mother during the four (4) months immediately preceding the birth of the child; provided, that in no instance shall a final order terminating the parental rights of a parent as determined pursuant to this subdivision (iii) be entered until at least thirty (30) days have elapsed since the date of the child's birth;

(iv) A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child;

\*                                    \*                                    \*

(D) For purposes of this subdivision (1), "willfully failed to support" or "willfully failed to make reasonable payments toward such child's support" means the willful failure, for a period of four (4) consecutive months, to provide monetary support or the willful failure to provide more than token payments toward the support of the child;

(E) For purposes of this subdivision (1), "willfully failed to visit" means the willful failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation;

(F) Abandonment may not be repented of by resuming visitation or support subsequent to the filing of any petition seeking to terminate parental or guardianship rights or seeking the adoption of a child; and

(G) "Abandonment" and "abandonment of an infant" do not have any other definition except that which is set forth in this section, it being the intent of the general assembly to establish the only grounds for abandonment by statutory definition. Specifically, it shall not be required that a parent be shown to have evinced a settled purpose to forego all parental rights and responsibilities in order for a determination of abandonment to be made. Decisions of any court to the contrary are hereby legislatively overruled;

T.C.A. § 36-1-113(c) allows for termination of parental rights if any one of the grounds outlined in T.C.A. § 36-1-113(g) is found by clear and convincing evidence, and termination is in the best interest of the child.

**Grounds for termination of Mr. Henry's parental rights to C.S.L.S**

We will first address whether there is clear and convincing evidence in the record to support the grounds for termination of Mr. Henry's parental rights to C.S.L.S. From our reading of the Order in this case, it appears that the trial court terminated Mr. Henry's parental rights on grounds of abandonment, T.C.A. § 36-1-113(g)(1). The trial court based its finding of abandonment as to Mr. Henry on at least two of the statutory definitions of that term: (1) willful failure to support and/or willful failure to visit, T.C.A. § 36-1-102(1)(A)(i); and (2) conduct demonstrating a wanton disregard for the welfare of the child, T.C.A. § 36-1-102(1)(A)(iv). The trial court also based termination of Mr. Henry's parental rights on grounds of persistence of conditions. T.C.A. § 36-1-113(g)(3)(A). We will examine each of these grounds against the record before us.

The record indicates that Mr. Henry was incarcerated around March of 2000 for possession of Schedule II drugs with intent to sell and two counts of theft over $1,000. Prior to his incarceration, Mr. Henry admitted that he had engaged in activities with Ms. Stinson that could have caused a child to be conceived. While he was incarcerated, Mr. Henry found out that Ms. Stinson was pregnant with C.S.L.S. He testified that he asked if he was the father and she told him that he was not. Mr. Henry took Ms. Stinson's word and made no further inquiries as to his paternity. However, he testified that he had some doubts as to whether he was the father, to wit:

> Q [to Mr. Henry]. What–at any point, did you still have questions as to whether or not you were the father of [C.S.L.S.]?
>
> A. I had wondered.

Q. You still had wondered?

A. No. Because I know he is now mine.

Q. Before the DNA test?

A. It was always in the back of my mind that he could be. And if he was, I wanted to be there for him.

Mr. Henry was released from jail and placed on probation in November of 2000. Despite his testimony that he still wondered if C.S.L.S. was his child, Mr. Henry took no steps toward finding out about his paternity or any steps to establish a relationship with C.S.L.S. during his probation, to wit:

Q. What about the time that you were on probation? Did you have discussions at that point of time as to whether or not you were the father of [C.S.L.S.]?

A. Yes.

*                                    *                          *

Q. Then, at what time during that time did you try to determine whether or not you were the father of [C.S.L.S.]?

A. None

Mr. Henry's probation was short lived and he was arrested in July of 2001 for violation of probation. He is currently serving an eight years sentence.

Despite the fact that Mr. Henry took no steps to determine his paternity even though he had some question as to whether he was C.S.L.S.'s father, Mr. Henry knew that he was C.S.L.S.'s father in December of 2002, when the results of the DNA testing were available. The record indicates that, since that time until the filing of the petition to terminate his parental rights in January 2004, Mr. Henry has taken no steps to form a relationship with his son. Although Mr. Henry could have gotten access to the Damrons' phone number and could have made calls to C.S.L.S., he took no action, to wit:

Q. In the penitentiary, are you able to use the telephone to try to call the child?

A. Yes, ma'am, but they got a list. You got to get the number to put on your approved list.

-18-

Q. So, you wouldn't be able to without having that phone number on your list; correct?

A. I can get it on my list?

     *                         *                        *

Q. So, what have you done as far as getting his [C.S.L.S.'s] phone number on your list? You said, that you can make–

A. I don't even know Mrs. Damron's number. And I have called [Ms. Stinson] in the past and talked to him, while he was over there.

Q. Did you not ask [Ms. Stinson] for Mrs. Damron's phone number?

A. No.

Q. Did you ask [DCS] for Mrs. Damron's phone number?

A. No.

Q. You have not asked anyone for Mrs. Damron's phone number?

A. No.

Mr. Henry further testified that he has paid no support for C.S.L.S. and that he has only seen the child two times (both occasions where Ms. Stinson brought C.S.L.S. to the jail). Concerning those two visits, Mr. Henry testified as follows:

Q. Would you agree, would you not, Mr. Henry, that two visits of an hour each is not enough to establish a relationship with him [C.S.L.S.]? Is that correct?

A. Yes, ma'am.

In fact, the record reveals that neither Mr. Henry nor his family has any bond with C.S.L.S. and that C.S.L.S. has no real knowledge of his biological father.

In his brief, Mr. Henry seems to indicate that DCS did not make reasonable efforts before petitioning for termination of his parental rights. Under T.C.A. § 37-1-166(a) (2005), the court is required to determine whether DCS made "reasonable efforts" for reunification of the family. T.C.A. § 37-1-166(g)(1) defines "reasonable efforts" as follows:

-19-

As used in this section, "reasonable efforts" means the exercise of reasonable care and diligence by the department to provide services related to meeting the needs of the child and the family. In determining reasonable efforts to be made with respect to the child, as described in this subdivision, and in making such reasonable efforts, the child's health and safety shall be the paramount concern.

Nevertheless, reunification of a family is a two-way street, and the law does not require DCS to carry the entire burden of this goal. The record indicates that Mr. Henry received notification concerning these proceedings and that he had the opportunity to participate. Within the confines of its own resources and the specific circumstances of this case (i.e. Mr. Henry's incarceration), it is the opinion of this Court that DCS has made reasonable efforts in this case. Unfortunately, Mr. Henry, by virtue of his incarceration and other circumstances, has been unable to reciprocate in the process of reunification. From the record before us, we conclude that there is clear and convincing evidence to support the trial court's finding that Mr. Henry's parental rights to C.S.L.S. should be terminated on the grounds of abandonment for willful failure to support and willful failure to visit during the statutory period. Furthermore, there is ample evidence in the record to support a finding that Mr. Henry's activities before incarceration, during incarceration, and during probation demonstrate a wanton disregard for his own welfare much less that of the child.

**Grounds for termination of Ms. Stinson's parental rights to C.S.L.S and T.D.S.**

In addition to the grounds of abandonment and persistence of conditions, Ms. Stinson's parental rights to the Children were also terminated on the grounds of failure to substantially comply with her responsibilities in the permanency plans, T.C.A. § 36-1-113(g)(2). As discussed by this Court in *In re M.J.B.*, 140 S.W.3d 643 (Tenn.Ct.App.2004):

> Terminating parental rights based on Tenn. Code Ann. § 36-1-113(g)(2) requires more proof than that a parent has not complied with every jot and tittle of the permanency plan. To succeed under Tenn.Code Ann. § 36-1-113(g)(2), the Department must demonstrate first that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place, *In re Valentine*, 79 S.W.3d at 547; *In re L.J.C.*, 124 S.W.3d 609, 621 (Tenn.Ct.App.2003), and second that the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met*. In re Valentine*, 79 S.W.3d at 548-49; In re Z.J.S., 2003 WL 21266854, at *12. Trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance. *In re Valentine*, 79 S.W.3d at 548; *Department of Children's Servs. v. C.L.*, No. M2001-02729-COA-R3-JV, 2003 WL

22037399, at (Tenn.Ct.App.Aug.29, 2003) (No Tenn. R.App. P. 11 application filed).

*Id*. at 656-57.

Under the permanency plans established in this case, Ms. Stinson was required to attend parenting classes, to seek drug and alcohol counseling, to submit to drug tests (including a hair-follicle test), to maintain stable employment, and to resolve all of her criminal issues. The record supports a finding that these requirements are reasonable and related to remedying the conditions that caused the Children to be removed from Ms. Stinson's custody in the first place. The record indicates that Ms. Stinson understood the requirements of the permanency plans and that she agreed to same. The record also indicates that DCS, Ms. Stinson's attorney, and Mrs. Damron were instrumental in encouraging and assisting Ms. Stinson in trying to meet those requirements. Nonetheless, Ms. Stinson admits that she failed to comply with the plans, to wit:

Q [to Ms. Stinson]. Would you agree that you didn't complete the duties and responsibilities on the Permanency Plans that you signed?

A. Yes.

Q. And you have seen it [the plans]?

A. Yes.

Q. And your attorney and yourself have had opportunities to have at least seen "The Criteria for Termination of Parental Rights"; correct?

A. Yes.

Q. Do you remember signing that?

A. Yes.

Q. And you understood at that time what it meant that you needed to do to get your children back?

A. Yes.

Q. And up until the time that the Petition was served upon you to terminate your parental rights, you had not accomplished the goals that you needed to accomplish to have the children returned to you; correct?

A. No, I didn't.  I was trying, but I was fighting a losing battle.

By her own admission, Ms. Stinson has failed to substantially comply with the requirements of the permanency plans.

Concerning the grounds of abandonment, we cannot conclude that Ms. Stinson has willfully failed to visit with these Children during the statutory period.  Although the record indicates that her visitation has always been sporadic, and that, at one time, she did not visit from Easter until November, she has (during the four months immediately preceding the filing of the petition to terminate her parental rights) visited and phoned the children under the supervision of Mrs. Damron.  However, the record does support a finding of abandonment for willful failure to support the Children.  Although Ms. Stinson's employment history is also sporadic, she had held jobs periodically throughout the time the Children have been in DCS custody.  However, the record indicates that she has not paid any support (other than token) for these Children.

Finally, on the grounds of persistence of conditions, these Children initially came into DCS custody due to indications of abuse (i.e. burn marks, head lice, diaper rash, and being unkempt).  As Ms. Stinson points out in her brief, these conditions have been remedied by placing the Children in foster care.  This Court, however, is concerned with the underlying conditions in Ms. Stinson's life that led to these Children being neglected while they were in her legal custody.  The record indicates that Ms. Stinson has abused drugs and alcohol since she was twelve years old (at the time of the hearing in this matter, she was twenty-three).  Because of her substance abuse, Ms. Stinson has been unable to maintain stable relationships, employment, or housing–and these are the conditions that ultimately led to removal of the Children.  At the time of the hearing, Ms. Stinson had completed a drug rehabilitation program at Teen Challenge; however, there is some indication in the record, that Ms. Stinson had been seen under the influence since her release from that program.  The record also reveals that Ms. Stinson has had previous drug rehabilitation, both in-patient and outpatient, and that she has relapsed following those treatments.  In addition, as of the date of the hearing, Ms. Stinson had no housing of her own, she was engaged to Sean Strickland (a man that she had formerly done drugs with, according to her own admission).  While the hearing in this case was still going on, Ms. Stinson quit her job as a carpet layer (making $8.00 per hour), and has started another job making $7.00 per hour.  In short, her employment is still not stable.  Although, the record indicates that Ms. Stinson is at least trying to gain control over her addiction and to seek stability in her life, there is no support for a finding that these changes have been completed to the point of permanency.  These Children have been in DCS custody for most of their young lives.  Ms. Stinson has had ample opportunity to effect the necessary changes in her life in order to parent her children.  However, the record shows that she has not made significant steps toward that goal.  The Children are now in a stable environment where they are well loved and cared for.  There is every indication that the Damrons wish to adopt the brothers.  At this point, continuing the parent/child relationship with Ms. Stinson will only work to delay the Children's integration into a safe, stable, and permanent home.  Consequently, we conclude that there is clear and convincing

evidence in the record to support the grounds for termination of Ms. Stinson's parental rights to the Children.

**Best Interests**

Before a court in this State can terminate a biological parent's parental rights, it must find that doing so is in the best interest of the child. *See* T.C.A. § 36-1-113(c)(2). In determining whether termination of parental rights is in a child's best interest, the lower court must consider the following factors:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian

from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

T.C.A. § 36-1-113(i) (2005).

This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest. *State v. T.S.W.*, No. M2001-01735-COA-R3-JV, 2002 Tenn.App. LEXIS 340, at *9 (Tenn.Ct .App. May 10, 2002).

The record before us is replete with evidence to support a finding that termination of Mr. Henry and Ms. Stinson's parental rights is in the best interests of these Children. Numerous witnesses testified that the Children have bonded with the Damrons and that the Damrons have provided a stable, and loving home for these boys. Although C.S.L.S. has some bond with Ms. Stinson, the record supports a finding that his bond is stronger with his foster mother. The record indicates that T.D.S. has primarily bonded with the foster mother. These bonds are not surprising considering the fact that C.S.L.S. has been with the Damrons since he was one and T.D.S. has been with them since he was four months old.

There is also substantial testimony concerning the bond these brothers have with each other. Ms. Stinson's grandfather testified that he has some concern with Ms. Stinson's ability to care for both Children. There is also some indication in the record that Mr. Henry's father wishes to have custody of C.S.L.S., his biological grandson. However, the record supports a finding that separating these two brothers would be extremely detrimental to each of them. On the other hand, the Damrons have expressed a desire to adopt both boys and to raise them together.

As discussed above, neither Mr. Henry nor Ms. Stinson have ever provided any significant support for these Children. Also, neither party has been able to maintain stable employment and/or housing. There is also no meaningful relationship between Mr. Henry and C.S.L.S. Although there is some bond between the boys and Ms. Stinson, there is no indication that the Children suffer separation anxiety after visiting with Ms. Stinson, or that they ask about her when she is absent. Rather, the record indicates that the Children recognize the Damrons as their mother and father and have bonded with them accordingly. Consequently, the trial court's finding that termination is in the best interests of these Children is supported by clear and convincing evidence in the record.

**Case Recordings**

Ms. Stinson asserts that the trial court committed reversible error by admitting, over

-24-

objection, the DCS case recordings. Specifically, Ms. Stinson asserts that these records contained hearsay. We first note that the trial court is afforded wide discretion in the admission or rejection of evidence, and the trial court's action will be reversed on appeal only when there is a showing of an abuse of discretion. *See Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d 439 (Tenn.1992); *Davis v. Hall*, 920 S.W.2d 213, 217 (Tenn.Ct.App.1995).

The case recordings at issue are the business records of DCS, which were maintained in accordance with DCS's internal procedures. As such, these records are generally admissible as records of regularly conducted business activities. *See* Tenn. R. Evid. 803(6). Because Ms. Stinson made no objection to any specific content of these records, there is no grounds for determining whether the records contained hearsay. Consequently, we cannot say that the trial court abused its discretion in allowing these records into evidence. Nonetheless, there is no indication that the trial court relied on these records in reaching its decision in this case. As discussed above, there is clear and convincing evidence in this record to support the trial court's findings even in the absence of these records. Therefore, even if we assume, *arguendo*, that the trial court should have sustained Ms. Stinson's objection as to the admissibility of these records, such error would be harmless considering the totality of the record.

For the foregoing reasons, we affirm the Order of the trial court terminating the parental rights of Mr. Henry and Ms. Stinson. Costs of this appeal are assessed one-half to Jason Henry, and his surety, and one-half to Patricia Danielle Stinson, and her surety.

_____
W. FRANK CRAWFORD, PRESIDING JUDGE, W.S.